Mary M. LOVE, Plaintiff,

v.

ALAMANCE COUNTY BOARD OF
EDUCATION, Defendant.

No. C–79–456–G.

United States District Court,
M.D. North Carolina,
Greensboro Division.

Feb. 29, 1984.

J. LeVonne Chambers of Chambers, Ferguson, Watt, Wallas, Adkins & Fuller, P.A., Charlotte, N.C., for plaintiff.

Paul H. Ridge of Ridge, Roberson & Richardson, Graham, N.C., and Martin N. Erwin of Smith, Moore, Smith, Schell & Hunter, Greensboro, N.C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HIRAM H. WARD, Chief Judge.

The Court tried the claims of plaintiff Mary M. Love, a black female, against defendant Alamance County Board of Education (Board) in this action without a jury on December 12–16, 1983. Plaintiff alleged in her Complaint (July 10, 1979) that the Board failed to promote her to various principal and assistant principal positions within the school system because of her race

and/or sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1), 42 U.S.C. §§ 1981, 1983 and the Thirteenth and Fourteenth Amendments of the Constitution. In her Proposed Findings of Fact and Conclusions of Law filed on September 23, 1983, plaintiff represented (in footnote 6) that she could obtain appropriate relief under Title VII and sections 1981 and 1983 and that the Court need not address her claims for relief under the Thirteenth and Fourteenth Amendments.

The parties submitted voluminous documentary evidence during the course of the trial. Having duly considered the parties' oral and documentary evidence, the Court now enters its Findings of Fact and Conclusions of Law thereon. Fed.R.Civ.P. 52.

## FINDINGS OF FACT

1. Mary M. Love, the plaintiff, is a black female who began her employment as a teacher in the Alamance County school system in 1957. Prior to her employment in the system plaintiff received a B.A. degree from Winston-Salem State University (WSSU), a predominately black university in North Carolina, and taught briefly in other school systems. In 1959 she received a M.A. degree in elementary education from North Carolina Central University, another predominately black school in this state. Plaintiff's first assignment within the system was at West End Elementary School where she served as an elementary education teacher. The school system was segregated until the late 1960's. Beginning with the 1969–70 school year, plaintiff transferred to an integrated school setting and taught reading at E.M. Yoder and South Mebane Elementary Schools. At that time plaintiff took summer courses at the University of North Carolina—Chapel Hill, but received no degree. Beginning with the 1971–72 school year plaintiff was placed permanently as a reading teacher at South Mebane Elementary School where Robert Gordon was her principal. At this time plaintiff began taking courses in school administration at North Carolina A & T University, a predominately black school, and received a principal certification, grades K–12, from the North Carolina Department of Public Instruction in May, 1972. Prior to receiving the certification plaintiff served as an intern under Robert Gordon at South Mebane Elementary School. From 1972 until 1976 plaintiff took a few education courses in reading at the University of North Carolina—Greensboro in order to acquire certification in reading. After 1972 plaintiff has only six hours of non-in-service education courses.[1]

2. On February 12, 1970, plaintiff submitted an application to John Deason, the Superintendent, for the position of Coordinator of Student Teaching. Defendant's Exhibit 25, plaintiff's Personnel Record, Letter dated February 12, 1970 (hereafter Personnel Record). Judith Wish was selected for the position. Plaintiff testified that she was better qualified because she had approximately ten more years of teaching experience and was more familiar with WSSU, a college with which the Coordinator must work closely and not a newcomer to the school system. Wish had equivalent degrees and had taught about four years. In addition, Wish had a certification in supervision, the Coordinator's primary function. Defendant's Exhibit 43.

3. On July 1, 1971, Dr. Robert A. Nelson became the superintendent of the school system, replacing John Deason. Nelson held that position until April 30, 1983.

4. C. David Green was the Assistant Superintendent for Personnel from 1971 to 1978. From 1978 until August, 1979, Robert Gordon held this position and was replaced by Robert Stockard. R. Hardy Tew served as the Assistant Superintendent for Instructional Support Services from 1971 up to the trial. The Assistant Superintendent for Physical Support Services from September, 1979, to the date of trial was Charles Jefferies, Jr., a black.

---

1. An in-service course is an education course taught within the school system. *See* Defendant's Exhibit 25, Certification of Credit dated November 19, 1970.

5. The school system began desegregating in the late 1960's and was in the process of desegregating in 1971 when Nelson became the Superintendent. Plaintiff testified that by 1970 the system had desegregated the teaching staff. The Office of Civil Rights (OCR), a federal agency with significant powers over school desegregation efforts, accepted the system desegregation plan in September, 1971. Plaintiff's Exhibit 11(b), Letter dated August 5, 1974, from OCR Director to Nelson. In August, 1974, OCR advised Nelson of its criticism of an interdistrict transfer policy which it linked to excessive black enrollment at two schools and its belief that blacks were under-represented among school administrators. OCR demanded corrective action before the 1974–75 school year to ensure continued receipt by the system of Emergency School Aid Act (ESAA) funds. Plaintiff's Exhibit 11(b).

6. Nelson testified without contradiction that no black principal was displaced or dismissed as a result of desegregation rezoning after his arrival.

7. On May 26, 1975, the Board adopted an Affirmative Action Plan (Plan) (Plaintiff's Exhibit 11). The purpose of the plan was "to restore the staff of principals (including principals and assistant principals) and coaches of the School System to its predesegregation composition of a 20 percent minority coaching staff and a 20 percent minority principals staff.." Plan § I. The Plan specifically provided that until the 20 percent goal is reached for principals, the system will hire at least one new black principal for each new white principal hired. Plan § II. Of course, the Plan did not require the system to hire anyone who did not meet the system's nondiscriminatory employment requirements. Furthermore, pursuant to the Plan, the system would be relieved of all the Plan's requirements and would not be required to maintain a 20 percent minority composition once the 20 percent goal was obtained. Plan § II.

8. The system did not meet some of the goals or requirements of the Plan. At section III A.9. the Plan provides that "[p]resently-employed subordinate personnel shall be automatically considered for promotion when vacancies occur in subordinate positions." The practice within the system was and continued to be consideration of all persons who expressed an interest in promotion to a new position. There is no evidence anyone within the system attempted to hide the existence of openings. On the other hand, the Central Office of the school system disseminated Notices of Vacancies concerning openings in principalships at least as early as 1971 to in-state colleges and all schools within the system. Defendant's Exhibit 18; Plaintiff's Exhibit 5 at 2–3.

9. The system did not fulfill the requirements that hirees must be evaluated "pursuant to written, objective, and lawful employment criteria." Plan § III C.1. Nelson testified that the various selection procedures utilized by the system involved predominately subjective evaluations of applicants. Nelson also testified that he perceived such evaluations as essential and irreplaceable. Contrary to section III C.3. the system never issued explanations as to "why the successful candidate was the most appropriate person for the position." (To a very great extent those explanations have been the subject matter of trial testimony.) Section III C.2. required standardized written evaluations in order to permit accurate comparisons between applicants. The system did not fulfill this requirement because it never developed written evaluations for principal and assistant principal positions. However, the procedures utilized were standardized. All witnesses with experience in the selection procedure testified that applicants were subjected to the same questioning and analysis by Nelson and selection committees.

10. Contrary to sections III D.1. & 3. the system never developed a written analysis of its recruitment, hiring, and promotion practices "in an effort to reveal any factors which would tend to impede the System's ability to achieve ..." 20 percent representation. In light of the purpose of

this analysis, its need is questionable because during the 1975–76 school year immediately following adoption of the Plan in May, 1975, the system *successfully* hired principals on a 1:1 ratio and achieved the 20 percent goal. As previously noted, once 20 percent representation was achieved among principals (which includes assistant principals) these requirements were lifted.

11. On July 25, 1975, OCR waived the system's ineligibility for ESAA funds based on the system's assurances that it would implement the Affirmative Action Plan, remedy a discriminatory demotion of James Carter, and remedy any remaining effects of a former dual pattern of student assignment. Plaintiff's Exhibit 11(a), Letter dated July 15, 1975, from OCR to Nelson. There is no evidence that OCR or any other federal or state agency has levelled any criticism at the school system relating to minority concerns or that the system is not completely eligible for ESAA funds since July, 1975.

On September 28, 1978, a group of black parents led by plaintiff's mother, Annie Miles, informed the Board of their concerns regarding the promotion of female nonwhite employees into administrative positions. Plaintiff's Exhibit 15. Walstein Snyder, a Board member, recalled this occasion and the Board's subsequent investigation of Miles' complaint, which revealed in the Board's opinion no justification for the complaint. On another occasion (date unknown) the Human Relations Committee in Alamance County expressed to Nelson its concern about requests for more blacks in administrative jobs. Nelson relayed this concern to the Board.

12. Documentary evidence substantiates Nelson's testimony that the system achieved 20 percent black representation among principals and assistant principals in 1976. In the 1976–77 school year there were blacks filling six of the thirty principal and assistant principal slots within the system. Plaintiff's Exhibit 21e, Report to Equal Employment Opportunity Commission (EEOC). This percentage continued in subsequent years. Plaintiff's Exhibits 21f & h, Reports to EEOC. During the 1975–76 school year the system hired two blacks (Terry Dixon and Melvin Cannon) and two whites as principals. It also hired another white as an assistant principal. A black, Fred Smith, was offered an assistant principal position at Graham High School in 1975, but he refused the offer.

13. When Nelson became the Superintendent he studied selection procedures for administration positions in other systems and developed a selection procedure for principals and assistant principals. Selections of assistant principals were made essentially by the principal of the respective school following interviews by the principal and the Assistant Superintendent of Personnel. A principal's recommendation to the Superintendent that a person be hired as an assistant principal was tantamount to that person's selection.

Applications for principal positions were first screened by Nelson and Green, the Assistant Superintendent of Personnel. Subsequently, a committee of Nelson, Green, and Tew, the Assistant Superintendent for Instructional Support Services, interviewed the selected or screened applicants. Following the interviews, the committee would make a recommendation to the Board. The above-described procedures were in effect until 1977.

14. In 1977 Nelson decided to substantially alter the selection process for principals.[2] The new procedure involved initial screening by the Superintendent and the Assistant Superintendent for Personnel of applications, interviews by a committee of four to six people and consisting usually of Central Staff personnel and principals selected by the Superintendent and the Assistant Superintendent of Personnel, interviews by the Superintendent of some or all of the persons recommended by the Committee, and, finally approval or rejection by

---

**2.** The selection process for assistant principals remained unchanged.

the Board of the Superintendent's recommendation.[3]

15. In support of her allegations plaintiff claims that the relatively unstructured committee procedure facilitated discrimination against her because of her sex and/or race. Dr. E. Edmund Reutter, Jr., Ph.D. in Educational Administration, provided deposition testimony (Plaintiff's Exhibit 33) critical of the committee interview procedure. He pointed to the lack of or inadequacy of job descriptions and written criteria in that there could be no objective analysis of candidates. He advised that the written forms (Defendant's Exhibit 32 & Plaintiff's Exhibits 22 & 23) or selection criteria used by committees were too broadly phrased and not designed to insure that all committee members have the same understanding of terms or criteria. Plaintiff points to the absence of oral or written instructions by Nelson to committees as to how to judge and compare applicants as further evidence that the selection process was a charade. Nelson testified that he never specifically told committees about the Affirmative Action Plan (which was not in effect as to principals in 1977 and later).

16. The Court finds that Nelson, Green, Tew, the committees, and other selecting officials honestly attempted to use their best professional judgment when recommending applicants to higher authorities. The Court finds that the committee procedure adopted in 1977 did not tend to disfavor blacks or females. As a rule the staffing of committees included blacks and women, including black females. Defendant's Exhibit 5, Chart of Committee Memberships. The Court credits Nelson's testimony that the motivations behind the procedure change in 1977 were (1) the sheer number of interviews, (2) the belief that committees would naturally counteract the influence of bias, and (3) the belief that committees would likely select successful people. Nelson testified that his singular instruction to committee members was to use their best professional judgment when selecting applicants for recommendation. Mary Murray, a black female and committee member who interviewed the plaintiff, testified that members in fact did rely on their best professional judgment when selecting applicants for recommendation. Anna Bass, another black female and committee member who interviewed plaintiff, testified that all applicants were asked basically identical questions. She described these questions as fair and job-related. The testimony of Charles Jefferies, a black male and committee member who interviewed plaintiff, concurred with that of Murray and Bass. Each committee member had input into an overall or consensus evaluation by the committee. Even the plaintiff agreed that the questions of the several committees before which she appeared were similar and that each committee member would ask questions concerning matters within that member's expertise, i.e., Charles Jefferies would ask about physical plant matters. Robert Stockard, a committee member and a white male, testified in concurrence with the above witnesses that all applicants were asked the same questions which grew out of each member's specialty and that members used their best professional judgment in making selections.

17. Statistical evidence gives no support to plaintiff's contentions about the selection procedures. Defendant provided expert testimony from Dr. Jane Harworth, Ph.D., an expert in statistical analysis. Dr. Harworth examined applicant flow and hiring data for 1975–1983 (Defendant's Exhibit 8) and performed a binomial distribution analysis. When the raw data involved small pools, she utilized the Fisher's Exact Test which she described as a more precise version of the student T test. Dr. Harworth testified that there is no statistical support for the existence of a non-neutral policy or of a pattern or practice of discrimination against blacks or females. Her analysis (Defendant's Exhibit 8) shows that the actual numbers of black or female hirees were within the range of two standard

---

**3.** The Board rejected Nelson's recommendation on one occasion because of sizeable community pressure in favor of another applicant whom the committee had recommended also.

deviations. She further observed that the success rate of blacks and females exceeded whites and males, respectively. Defendant's Exhibit 8, Table 11 (based on applicants who received job offers). Plaintiff offered no statistical evidence disputing Dr. Harworth's calculations or conclusions.

18. In July, 1971, plaintiff applied for the principalship at Sylvan Elementary School. Plaintiff was interviewed and rated by Green as a good candidate if she could meet the certification requirements. Plaintiff's Exhibit 30. Nelson filled the position by transferring Jack O'Kelly, a black principal, into this position which a white was vacating. Plaintiff alleged sexual discrimination against her. The Court finds that there was no sexual discrimination because, not only did plaintiff lack a principal certification or, apparently, even provisional principal certification, plaintiff admitted on cross-examination that O'Kelly, who had several years of experience as a principal, was better qualified. Defendant's Exhibit 44.

19. Around June, 1972, plaintiff applied for the principalship at E.M. Yoder Elementary School. Nelson recommended to the Board that Dr. Douglas Jones be hired because Nelson believed he was the best candidate. Although plaintiff pointed out that unlike Jones she was not a newcomer to Alamance County, she testified that Jones who held a doctorate in Educational Administration was better qualified. The Court perceives no evidence of discrimination, sexual and racial, in Jones' hiring.

20. On June 20, 1972, Green advised plaintiff by letter that she did not get the E.M. Yoder position, but also stated that her "application will remain active and given consideration should other vacancies develop." Personnel Record, Letter dated June 20, 1972. Plaintiff testified that in April, 1972, she submitted a blanket application to Green to be considered for all administrative job openings. This letter is not in her Personnel Record although she testified that she recalled seeing it there in 1978. Plaintiff never mentioned to anyone the existence of the blanket application pri-

or to this lawsuit. Nelson has no recollection of such a letter. Nelson also testified that the system expected people to make known their specific interest in openings before they would be considered for an opening. The system never encouraged general application letters. Plaintiff was well aware of this policy. She testified that she knew she should make applications for specific jobs and that she did apply for jobs she believed she could do. The Court must conclude that plaintiff did not rely upon Green's gratuitous statement or upon the 1972 blanket application, if it existed.

21. On June 30, 1974, plaintiff applied for the principalship at Pleasant Grove Union School. Personnel Record, Letter dated June 30, 1974. Nelson recommended Robert Vaughn, who had three years prior experience as an assistant principal, to the Board. Nelson did not consider plaintiff because she applied for the position when it had been filled. Personnel Record, Letter dated July 1, 1974, from Green to plaintiff. Hence, the plaintiff never effectively applied for this position.

22. In the July 1, 1974, letter from Green to plaintiff in which he advised her that she had applied late for the Pleasant Grove Union School position, Green advised that they should continue discussing plaintiff's becoming the new Coordinator of Student Teaching, the same position plaintiff had applied for in 1970. Subsequently, Nelson selected plaintiff in the summer of 1974 to serve as the Coordinator beginning in the 1974–75 school year. Plaintiff replaced a white female, Priscilla Starling.

23. As the Coordinator plaintiff was responsible for placement and evaluation of all student teachers within the school system. However, because of a contract between the system and WSSU, plaintiff had special responsibilities concerning student teachers or student interns from that university. The contract obliged plaintiff on behalf of the system to assist WSSU students in finding housing and transportation. She also taught WSSU students.

24. Green, the Assistant Superintendent of Personnel, evaluated plaintiff's perform-

ance in January and June, 1975. Personnel Record, Evaluations dated January 30, 1975, and June 5, 1975. Overall Green evaluated plaintiff's performance as satisfactory in the January evaluation, but had some criticisms concerning plaintiff's punctuality, staying in contact with the Central Office when out of her office, and assignment of student teachers to non-approved teachers without prior review by the principal of the school affected. In the June evaluation Green stated that plaintiff had done a very good job but again criticized her punctuality as marginal but not unsatisfactory.

25. Nelson never personally evaluated plaintiff's performance as the Coordinator, but he received reports from others about her performance. Nelson testified that he believed plaintiff held promise or potential to be an effective administrator, but that her non-innovative performance as the Coordinator caused him to lose some confidence in her abilities. Green's evaluations in fact reflect no innovations or improvements in the student teaching program, although Green commented that plaintiff had done a good job. Plaintiff offered no evidence contradicting Nelson's perception of her performance as good, but not innovative.

26. The Coordinator position was terminated at the end of the 1974–75 school year because WSSU had chosen not to renew its contract. Termination of the contract cutoff funding by the university for the position. Termination was not plaintiff's fault. Aware of the termination, plaintiff began applying for other administrative positions to avoid a return to the classroom which would mean a drop in salary. She was not successful in these efforts and consequently accepted a teaching position at Woodlawn Middle School.

27. The parties presented evidence concerning a principal position opening at Graham High School in the summer of 1975. Plaintiff testified that she had no complaint about the position which was awarded to James Jenkins, a white male. Jenkins had several years prior experience as a princi-

pal and assistant superintendent. Defendant's Exhibit 48.

28. Plaintiff applied for the assistant principal position at Graham High School in July, 1975. Personnel Record, Letter dated July 29, 1975. Kenneth Stanley, a white male, received and accepted a job offer for this position, although the position was initially offered to Fred Smith, a black male. Although plaintiff testified that she has no complaint about this position, she also testified that she was better qualified than Stanley because she was not a newcomer to Alamance County. Defendant's Exhibit 47 reveals that Stanley had prior experience as a principal, assistant superintendent, and supervisor of secondary education in other school systems.

29. In May, 1975, plaintiff applied for the position of Director of Pupil Support Services. Personnel Record, Letter dated May 20, 1975. This position was offered to and accepted by Dr. Edward Robinson, Ph.D. in guidance and counseling. Robinson had prior experience in several administrative positions at two universities. Defendant's Exhibit 49. Plaintiff stated that she had no complaint about this position.

30. On August 5, 1975, plaintiff applied by letter for the principalship at South Mebane Elementary School. Personnel Record, Letter dated August 5, 1975. Frank Clements, a white male, received the position. Plaintiff contended that she was better qualified for the job. She pointed out that Clements had no supervisor certification, which she had, and that he received his principal certification three years later than she did. Plaintiff testified that she completed her principal internship at South Mebane under Robert Gordon. Plaintiff further noted that Clements' experience was primarily on the high school and college levels, unlike hers at the elementary level, and that she had taught at South Mebane in the early 1970's.

Nelson, who recommended Clements to the Board, was of the opinion based upon his professional judgment that Clements was the preferable applicant. Nelson had no recollection of talking with plaintiff

about the position and plaintiff could not recall being interviewed for the position. Nelson believed Clements was more qualified because (1) he had prior administrative experience as an assistant principal and experience as a guidance counselor, (2) he was in a doctoral program, (3) he was an analytical thinker and sought solutions satisfactory to all concerned, (4) and he had supervised student teachers in elementary schools while a teaching assistant at a university. *See* Defendant's Exhibit 50 (qualifications comparison of plaintiff and Clements).

31. On June 3, 1977, plaintiff applied for an assistant principal position opening at Graham High School. Personnel Record, Letter dated June 3, 1977. Charles Morris, Jr., was hired. Plaintiff was not considered for this position because she submitted her application approximately one month after the application deadline of May 11, 1977. Personnel Record, Letter dated June 16, 1977. On cross-examination she acknowledged this fact.[4]

32. In the summer of 1977 the principalship of North Graham Elementary School became open. Plaintiff applied on June 8, 1977. Personnel Record, Letter dated June 8, 1977. At this time Nelson had converted to the committee system for selecting principals. The committee which interviewed applicants, including plaintiff, for this position was the first such committee. The committee members included two males and three females, two of whom were blacks (Anna Bass and Mary Murray). Defendant's Exhibit 5.

Nelson could not recall whom the committee recommended or the people he interviewed among those recommended. Nelson selected Barbara Tew whom he considered more qualified than plaintiff. Although Tew had fewer certifications than plaintiff, she had taught almost as long as plaintiff and had about nine years of prior experience as a principal. Defendant's Exhibit 53. Nelson especially noted Tew's prior experience and reputation in the field of open education and her role in the development of a pilot kindergarten program as important factors in his decision. Anna Bass did not recall plaintiff as being an applicant recommended by the committee to Nelson although she recalled the committee recommending Tew, Fred Smith, a black, and four others to Nelson. Mary Murray testified in her deposition that early in the interview process she got the feeling Tew would be selected ultimately. However, she also stated that the committee looked at each candidate and that plaintiff was not as qualified as Tew in terms of experience. Plaintiff's Exhibit 1d, Deposition of Mary Murray at 15–19 & 24. Even plaintiff acknowledged Tew's better qualifications for the job.

33. Based on the foregoing findings the Court concludes that plaintiff was not the victim of racial discrimination in the selection of Tew.

34. During the selection procedures for the North Graham Elementary School position, plaintiff was referred on June 27, 1977, to the B. Everett Jordan Elementary School principalship opening. Personnel Record, Letter dated June 8, 1977. Green advised plaintiff of the opening, which was the result of Tew's vacating that position for her new position at North Graham. All unsuccessful applicants for the North Graham position were similarly referred. The North Graham interview committee also served as the interview committee for B. Everett Jordan. All applicants for the position were female and plaintiff was the only black.

35. The committee interviewed plaintiff. There are no records on whom the committee recommended. Anna Bass, a committee member, recalled that plaintiff and

---

**4.** Plaintiff testified that the Central Office directed her to see the principal at Graham High School, Edward Jenkins, for an interview, but that Jenkins advised her that he had no authority to employ an assistant principal because the Personnel Office had already hired someone.

The probable explanation for this contradiction lies in the lateness of plaintiff's application and/or Jenkins' earlier decision to hire the other person. The Court has previously described the hiring procedure for assistant principals.

Jane Burke were persons recommended by the committee. Nelson recommended Jane B. Burke to the Board for the job. Nelson did not recall interviewing plaintiff, however, plaintiff testified that Nelson did interview her. Mary Murray, a committee member, testified that all applicants received fair consideration. Plaintiff's Exhibit 1d at 36.

36. Nelson testified that he considered Burke better qualified than plaintiff for the position. Nelson stated that Burke was more energetic and had a reputation for putting in extra hours and that she was articulate on educational issues. Nelson noted that from 1974 to 1977 Burke had been a teacher and assistant principal at Southern Middle School in Alamance County and that at the time she had almost earned her second master's degree. (Burke testified that she in fact had the degree, in administration, at the time.) Burke had been a teacher for about ten years. One particular factor in Nelson's decision was Burke's support of open education which Nelson strongly favored as an educational theory. She had taught in an open classroom setting at South Mebane Elementary School during 1971–74. B. Everett Jordan had an open classroom/team teaching structure. Plaintiff lacked similar experience.

Nelson selected Burke although she lacked a principal certification at the time. Apparently she had recently earned a M.A. degree in administration but lacked one course in sociology and an exam before being qualified for a principal certification. (Certification was not required to be an assistant principal.) However, the State had given Burke a provisional principal certification which qualified her to serve as a principal for one school year. (Burke earned a principal certification during the first semester of the 1977–78 school year.)

Plaintiff testified that she was better qualified because (1) she was not a newcomer (*i.e.*, Burke entered the system in 1971 while plaintiff entered in 1956); (2) she had a M.A. Degree in elementary education; (3) she did volunteer work for the school system, and (4) most importantly, she already had her principal certification (since 1972) while Burke only had a provisional certification. Mary Murray testified that she felt plaintiff was more qualified because she was not a newcomer, had more experience, and already had the required certification. However, Murray testified in her deposition that she had believed at the time of the selection process that Burke would be hired because she was well respected by people who would be influential in the final selection. Plaintiff's Exhibit 1d at 35. Respect for Burke is not discrimination against plaintiff.

37. Defendant's Exhibit 52 lists the paper qualifications of Burke and plaintiff. Looking at that alone the Court would be hard pressed if in Nelson's shoes to choose the better qualified. However, Nelson's testimony about why he favored Burke for the job strikes the Court as credible.[5] Racial discrimination was not a motivating factor. Nelson chose a person recommended by the committee and possessing qualifications which he considered important for the position. Finally, since blacks were highly represented on the committee, it is extremely unlikely the committee discriminated against plaintiff.

38. In July, 1977, an assistant principal position at Southern Middle School became open. Plaintiff did not apply and makes no complaint about it. Sheila Bowles, a black female, was hired.

39. On September 21, 1978, plaintiff applied for the principal position at B. Everett Jordan Elementary School. Personnel Record, Letter dated September 21, 1978 (at this time Robert Gordon, now a Ph.D., had replaced Green as Assistant Superintendent of Personnel). Plaintiff was the only black out of nine applicants. Defendant's Exhibit 3. There was a total of three female applicants. The applicants were in-

---

5. In her testimony plaintiff commented that there is more to qualifications than degrees and certifications. Dr. Reutter also ultimately de-

scribed selecting a principal or assistant principal as a judgment call. Plaintiff's Exhibit 33 at 106.

terviewed by a committee consisting of four people. There were two females, Mary Murray and Jane Burke. Gordon and R. Hardy Tew were the two males on the committee. Defendant's Exhibit 5. The committee as a whole recommended three persons in preferential order: (1) Willis Wheeler, (2) Joe Shull, (3) plaintiff. All the individual committee members ranked plaintiff as third except Gordon who ranked her second. They unanimously recommended Wheeler as the first choice, although he was a newcomer to the system and had been a teacher only since 1973. Defendant's Exhibit 15.

Nelson unilaterally eliminated Shull, a white male, from consideration for some unspecified reason. Nelson interviewed Wheeler, a white male, and plaintiff and selected Wheeler. Nelson explained that he chose Wheeler because of his superior performance during the interview along with his background which included prior experience as an assistant principal from 1976–78 at an elementary school. Nelson also considered Wheeler's familiarity with computers as a plus factor. Plaintiff's Exhibit 1b, Deposition of Robert A. Nelson at 72–73. By comparison, Nelson described plaintiff's responses to his interview questions (the same ones he posed to Wheeler (Plaintiff's Exhibits 22 & 23)) as vague, incomprehensible, and/or superficial. After the interview plaintiff confessed to Nelson her inarticulateness. Plaintiff's Exhibit 22; Defendant's Exhibit 15. At the trial, plaintiff stated that interviews make her uncomfortable. In her deposition she stated that she possibly had not answered Nelson's questions in the manner Nelson thought she should. Plaintiff's Exhibit 1a, Deposition of Mary M. Love at 29–30.

40. In light of the foregoing findings the Court finds that plaintiff's failure to obtain the B. Everett Jordan principalship in 1978 was not caused by racial or sexual discrimination.

41. Plaintiff filed a charge of racial and sexual discrimination with the EEOC on October 27, 1978. The charge was directed at the system's hiring of Wheeler in the fall of 1978 for the B. Everett Jordan position.

42. In November, 1978, the principalship at E.M. Yoder Elementary School became open. Carl Herman, a white male, was recommended by a committee of two males and two females, one black, was hired. Defendant's Exhibits 14 & 68. Plaintiff testified she was more qualified. However, the committee and Nelson did not consider plaintiff because she did not apply.[6]

43. Plaintiff filed this lawsuit on July 10, 1979, after receiving a right-to-sue letter on June 22, 1979. Plaintiff's Exhibit 3.

44. Plaintiff did not apply for the principalship at Southern Middle School which was filled by Gretchen Briggs in August, 1980. Defendant's Exhibit 27.

45. Plaintiff did not apply for the principal position at Altamahaw-Ossipee Elementary School which Sheila Bowles filled in August, 1980. Defendant's Exhibit 28.

46. Plaintiff applied for the principalship at E.M. Holt Elementary School in June or July of 1980. A committee of two males and three females, one black, interviewed the applicants and submitted plaintiff as its fifth preference among five persons recommended to Nelson. Defendant's Exhibit 26. Nelson interviewed only the top three recommended. Plaintiff testified she has no complaint about the hiring of Frank Clements.

47. During the interview process for the E.M. Holt position in July, 1980, Robert Stockard, who replaced Gordon as the Assistant Superintendent of Personnel, contacted plaintiff about an assistant principal opening at Western Middle School for the 1980–81 school year.[7] The school principal,

---

6. Plaintiff testified that her application was her blanket application submitted in 1972. Neither the committee nor Nelson was aware of any such application.

7. Defendant's Exhibit 29 lists applicants for this assistant principal position. Plaintiff's name does not appear. This probably can be attributed to the fact that Stockard contacted plaintiff

Wilma Parrish, subsequently interviewed plaintiff for the job at the Central Office. Nelson testified that Parrish informed him that plaintiff withdrew her application because she was not interested in the mechanical duties of the assistant principal at Western Middle School. Plaintiff acknowledged in her testimony that Parrish described certain mechanical duties, but denied expressing a disinterest in the job to Parrish or Stockard. Stockard's testimony corroborates Nelson's. Stockard testified that plaintiff visited his office after her interview and advised him that she was not interested in the position because of the mechanical duties. Whether or not plaintiff intended to express disinterest in the position, Parrish and others understood her not to want the position.

48. On July 29, 1981, plaintiff applied for the principalship at North Graham Elementary School. Personnel Record, Letter dated July 29, 1981. An interview committee consisting of four males (one black) and one female interviewed the applicants including plaintiff. The committee recommended five people including one black, Clyde Lynn, but not plaintiff. Under "Remarks" on plaintiff's interview sheet dated August 7, 1981, the committee commented that plaintiff's leadership qualities were questionable, that she lacked assertiveness, and that plaintiff lacked knowledge of the principal's role. Defendant's Exhibit 33. Two committee members who were witnesses, Stockard, a white, and Jefferies, a black, testified that the committee's rating of plaintiff was by consensus. Jefferies indicated that Sam Fowler, the committee's first preference and the person hired, had a better understanding of the principal's role at least in those areas of interest to Jefferies, i.e., fiscal, food, transportation. Since the committee did not recommend plaintiff, Nelson did not consider plaintiff. Plaintiff's testimony that Fowler's prior experience had been at the high school level and

in biology (although he had served as an assistant principal for two years at Southern High School) in no manner disputes the committee's rather cutting assessment of plaintiff.

49. On August 26, 1982, plaintiff applied for the principalship at Sylvan Elementary School. Personnel Record, Letter dated August 26, 1982. The committee, which consisted of four males (one black) and one female, scheduled plaintiff's interview for 3:45 p.m. on September 20, 1982. The committee report (Defendant's Exhibit 26) indicates plaintiff cancelled the interview around noon of September 20. Stockard, a committee member, testified that plaintiff's was not considered because she cancelled her interview. Plaintiff admitted that she cancelled the interview—although her motivation to cancel was a statement by Lacose Edwards, Jr., an assistant principal at Woodlawn Middle School where plaintiff taught reading, to the effect that another applicant, Buford Frye, was sure to be selected. (In fact, Frye was the top choice of the committee which also recommended a black, Clyde Lynn. The Committee "highly recommended" Frye. Defendant's Exhibit 36.) [8] Edwards' prediction of Frye's favored status by an integrated interview committee and/or Nelson is extremely slim evidence of discrimination. In any event, the committee did not consider plaintiff because she withdrew from consideration.

50. On July 16, 1983, plaintiff applied for a principalship at South Mebane Elementary School. Personnel Record, Letter dated July 16, 1983. The committee which consisted of four males (one black) and one female recommended four people, all male including one black, Lacose Edwards, Jr., the assistant principal at Woodlawn Middle School. On the committee's interview record the committee noted plaintiff's many years of experience in reading and sincere interest in a principalship, but also

about the job while interviewing was apparently already in progress.

**8.** Plaintiff testified that she was better qualified because Frye had fewer years of experience

overall and in elementary education. Frye had been a guidance counselor since 1970 primarily in middle schools. Defendant's Exhibit 60.

her lack of experience in administration. Defendant's Exhibit 38. Stockard, a committee member, testified that plaintiff poorly answered his question concerning what steps plaintiff would take with an inadequately performing teacher. The black male on the committee was Bowman Burton, who was plaintiff's principal at Woodlawn Middle School. Plaintiff testified that Burton was familiar with her work and abilities. Burton endorsed the interview report. Plaintiff also testified that the committee questions were job related. The committee had standard questions for all applicants. Since the committee did not recommend plaintiff, Dr. Leonard Simmons, who replaced Nelson as Superintendent, did not interview plaintiff. Simmons recommended Sam Fowler to the Board. Fowler had two years prior experience as an assistant principal at Southern High School and two years prior experience as principal of North Graham Elementary School. Defendant's Exhibit 61. The committee rated Fowler highly. Defendant's Exhibit 38. Based on these facts, the Court concludes that sexual or racial discrimination did not motivate the committee's or Simmons' action.

51. Around August, 1983, plaintiff applied by phone for the principalship of Alexander-Wilson Elementary School. Plaintiff has no complaint about her failure to be hired for that job.

## DISCUSSION

Plaintiff alleged disparate treatment because of race or sex in violation of 42 U.S.C. § 2000e–2(a)(1) and/or 42 U.S.C. §§ 1981 and 1983.[9] The Court has jurisdiction to hear claims such as these pursuant to 42 U.S.C. § 2000e–5(f)(3) and 28 U.S.C. § 1343(a)(4).

**9.** This is a disparate treatment case, although this point is not entirely clear. In the Final Pretrial Order (July 7, 1981) plaintiff stated in her contentions that defendant maintained certain policies and practices which had a discriminatory effect on blacks. However, in her later filed Proposed Findings of Fact and Conclusions of Law (September 23, 1983) plaintiff stated only that she "had offered evidence of disparate treatment." In any event, the Court perceives

Certain limitations periods define the actions of defendant which may be the basis of liability. Section 2000e–5(e) of Title 42 provides in part that "[a] charge [submitted to the EEOC] under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice . . . ." Before a claimant may bring a suit in federal court under Title VII, she must have filed a charge with the EEOC in compliance with this limitation period. *Doski v. M. Goldseker Co.,* 539 F.2d 1326 (4th Cir.1976). Plaintiff may obtain relief under Title VII for discriminatory acts of defendant occurring within 180 days of the filing of a charge of discrimination with the EEOC. *Simmons v. South Carolina State Ports Authority,* 694 F.2d 63, 64 (4th Cir.1982). Discriminatory actions not complained of within the 180 day period are to be considered lawful under Title VII, although a plaintiff may present evidence of prior actions to prove discrimination. *Woodard v. Lehman,* 717 F.2d 909, 916 (4th Cir.1983). Plaintiff filed a charge with the EEOC on October 27, 1978. April 30, 1978, fell 180 days prior to then.

State law provides the proper statute of limitations for plaintiff's claims under sections 1981 and 1983. *King v. Seaboard Coast Line Railroad Co.,* 538 F.2d 581, 584 (4th Cir.1976). That period is the three year period provided by N.C.Gen. Stat. § 1–52(5). Since plaintiff filed this lawsuit on July 10, 1979, she may recover under sections 1981 and 1983 for discriminatory actions on or after July 10, 1976.[10] Hence, under these limitations plaintiff may recover only for adverse employment decisions beginning with the assistant principalship at Graham High School in June, 1977.

no evidence of neutral employment policies or practices which have had a discriminatory effect on blacks or women.

**10.** Claims of sex discrimination are not cognizable under 42 U.S.C. § 1981. *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976).

■ A civil rights claimant can sustain a theory of a continuing violation only where she establishes a discriminatory employment action within the requisite time period. *Woodard v. Lehman*, 717 F.2d at 916. Current effects of a past discriminatory action occurring outside the requisite time period cannot be sustained as a continuing violation. *Sanders v. Duke University*, 538 F.Supp. 1143, 1146 (M.D.N.C.1982); *accord, Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980); *cf., Patterson v. American Tobacco Co.*, 586 F.2d 300, 304 (4th Cir.1978) (when a discriminatory promotion system exists, a continuing violation occurs everytime there is a promotion).

■ In order to prove disparate treatment the claimant must first make a *prima facie* showing of discrimination, which the claimant accomplishes by producing evidence of actions by the employer which permit an inference that, more likely than not, those actions were based unlawfully upon the claimant's sex or race. If the claimant makes this showing, then the burden of producing evidence shifts to the employer to articulate through the introduction of admissible evidence, a clear and reasonably specific legitimate, nondiscriminatory reason for its action. The articulation of this reason dispels the adverse inference arising from the claimant's *prima facie* showing and entitles the employer to a judgment unless the claimant in the final stage of this scheme of proof can show that the stated reasons (*i.e.*, plaintiff is not as qualified) are pretexts for discrimination. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Cuthbertson v. Biggers Brothers, Inc.*, 702 F.2d 454, 458 (4th Cir.1983). A claimant can show pretext by evidence showing that "a discriminatory reason more likely motivated the employer or . . . the employer's proffered explanation is unworthy of credence." *Texas Department of Community Affairs v. Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095, 67 L.Ed.2d at 217. Plaintiff's evidence must support with "substantial" or "reasonable probability," as distinguished

from "possibility" or "speculation," plaintiff's contention that defendant's explanation is pretextual. *Fink v. Western Electric Co.*, 708 F.2d 909, 916 (4th Cir.1983). In this respect, it is not sufficient merely for a claimant to persuade the Court that the employer misjudged her qualifications, because an employer is entitled to exercise its own judgment as to qualifications. *Texas Department of Community Affairs v. Burdine*, 450 U.S. at 259, 101 S.Ct. at 1096, 67 L.Ed.2d at 219; *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012 n. 6 (1st Cir.1979). The burden of persuasion under this scheme of proof remains throughout on the claimant. This scheme of proof applies here equally to plaintiff's section 1981 and 1983 claims as well as her Title VII claim. *Lewis v. Central Piedmont Community College*, 689 F.2d 1207, 1209 n. 3 (4th Cir.1982), *cert. denied*, — U.S. —, 103 S.Ct. 1433, 75 L.Ed.2d 792 (1983).

■ Plaintiff alleged a series of discriminatory refusals to promote. She may establish a *prima facie* case of discrimination by proof that she belonged to a racial minority or sex, that she applied for a position for which she was qualified, that she was rejected, and that a person of the white race or a male was hired or promoted. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 677 (1973). Although these elements are not the sole method for establishing a *prima facie* case, *Cline v. Roadway Express, Inc.*, 689 F.2d 481, 485 (4th Cir.1982); *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 240 (4th Cir.1982), this method is adequate here because plaintiff's evidence sufficed to meet each element except for those positions for which she failed to apply, ineffectively applied, or withdrew from consideration. Establishing the initial *prima facie* case is not a difficult hurdle.

■ Plaintiff failed to establish an initial *prima facie* case as to the assistant principal position at Graham High School in June, 1977, because she applied well after the deadline for applications; the principal position at E.M. Yoder Elementary School

in November, 1978, because she failed to apply; and the principal position at Sylvan Elementary School in August, 1982, because she withdrew from consideration.

Defendant has presented legitimate, non-discriminatory reasons for not promoting plaintiff into the administrative positions in question. (The same is true for those positions for which plaintiff failed to establish an initial *prima facie* case.) Plaintiff failed to demonstrate these reasons to be pretextual. The evidence demonstrates clearly that Barbara Tew was perceived as the superior applicant for the principal position at North Graham Elementary School in the summer of 1977. The Court is firmly persuaded that Nelson chose Jane Burke for the B. Everett Jordan Elementary School principalship in the summer of 1977 because he, in his professional judgment, considered her best-suited for that position. Similarly, plaintiff has failed to show pretext in Nelson's explanation about why he chose Wheeler.

■■■ The Court is also aware that plaintiff's strongest case rests with the selection of Wheeler and Burke over her. However, if proof of a pattern of discrimination can support an inference that a particular adverse employment decision was motivated by discrimination, *Sumler v. City of Winston-Salem*, 448 F.Supp. 519, 527 (M.D.N.C.1978), then proof of repeated nondiscriminatory adverse employment decisions, as is the case here, weighs against any inference of discrimination in an employment decision at issue. In any event, plaintiff has fallen far short of evidence showing substantially or with reasonable probability that the defendant's reasons for hiring Burke or Wheeler are pretextual.

The selecting officials truly considered plaintiff to have withdrawn her application for the assistant principalship at Woodlawn Middle School in July, 1980, and to be a poorer candidate for the principalships at North Graham Elementary School in July, 1981, and South Mebane Elementary School in July, 1983.

■■ Plaintiff has stressed the subjective nature of the system's selection procedures from 1970 to 1983 as supporting her claims. The defendant has not attempted to argue that the procedures were not subjective. On the other hand, defendant has argued that subjective analysis of applicants for principal and assistant principal positions is essential. Use of subjective job criteria is not illegal under the civil rights laws, *Anderson v. City of Bessemer City*, 717 F.2d 149, 155 (4th Cir.1983), even if failure to use objective criteria is contrary to some affirmative action plan. *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir.), *cert. denied*, 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981). Of course, the trial court must closely scrutinize subjective procedures because such procedures permit discriminatory abuse. *Page v. Bolger*, 645 F.2d at 230. In *Brady v. Thurston Motor Lines*, 726 F.2d 136 (4th Cir.1984), the court of appeals pointed to the following factors as supporting a finding of discriminatory treatment: (1) subjectively based employment decisions, (2) absence of written job descriptions and qualifications, (3) failure to post notices of job openings, (4) a basically all-white supervisory force, (5) a paucity of job changes among blacks, and (6) statistical evidence of the channeling of blacks into certain jobs.

The defendant here is guilty of subjectively based employment decisions and the absence of written job descriptions and qualifications. The defendant did post job-opening notices and blacks and females customarily held positions on interview committees. Evidence showed that blacks held jobs at all levels within the school system and received promotions into administrative positions. There is no statistical evidence of channeling. The testimony of witnesses unanimously established that the selection procedures applied uniformly to all candidates throughout the period in question and that all candidates received fair consideration. Even the plaintiff would characterize her interview sessions as job-related. No evidence links the selection procedure to the failure to select any black or female.

Plaintiff argued that under the recent opinions of the Fourth Circuit in *Evans v. Harnett County Board of Education*, 684 F.2d 304 (4th Cir.1982) and *Knighton v. Laurens County School District No. 56*, 721 F.2d 976 (4th Cir.1983) the burden of persuasion must shift to the defendant to prove that its actions were not motivated by sexual or racial discrimination. In *Evans* the district court applied the *McDonnell Douglas/Burdine* scheme of proof. However, since the district court in *Evans* had found as a fact that despite desegregation the defendant board since 1969 had chosen whites as principals for previously all white schools, and *vice versa* for blacks, the Court of Appeals held that the burden of persuasion must shift. The appellate court stated that the burden shifts where there is a "finding of either intentional segregative action or a recent history of racial discrimination in a school system." 684 F.2d at 307. The court indicated that burden-shifting may be proper under other unspecified circumstances. In *Knighton* the appellate court held that the lower court erred in not making a finding concerning whether there was intentional segregative action or a recent history of racial segregation within the school system. The plaintiff in *Knighton* had presented evidence of the development of a pattern of discrimination against black school personnel.

Here there is no evidence of a disproportionate decimation of the ranks of black or female school personnel which could serve as the basis for burden-shifting as in *North Carolina Teachers Association v. Asheboro City Board of Education*, 393 F.2d 736 (4th Cir.1968) and *Chambers v. Hendersonville City Board of Education*, 364 F.2d 189 (4th Cir.1966). There is no evidence of whites being customarily assigned as administrative personnel to formerly all-white schools, and *vice versa* for blacks, as in *Evans*.

 There is extremely little, if any, evidence of a pattern of discrimination against black or female school personnel in work assignments or evaluations as in *Knighton*. OCR complained in 1974 about an alleged discriminatory demotion of James Carter, a black. Plaintiff presented no details about the Carter matter, however. There is no evidence that OCR complained at a later date about any personnel practice or decision.[11] On the other hand, the school system obtained (and maintained) the goal of 20 percent minority representation among principals set out in the 1975 Affirmative Action Plan. In 1977 the system began utilizing the committee procedure for selecting principals. The presence of blacks and women on these committees acts as a safeguard against discriminatory practices. *Page v. Bolger*, 645 F.2d at 231; *Wright v. National Archives and Records Service*, 609 F.2d 702, 714 (4th Cir.1979). The statistical evidence, as explained by Dr. Harworth, lends no support to the presence of a pattern or practice of discrimination against blacks and females. In her Supplemental Proposed Findings and Brief (January 10, 1984) plaintiff, who presented only raw data at trial, attempted to show that a pattern of discrimination existed in the selection of assistant principals from 1975 to 1983. However, Dr. Harworth's testimony addressed that same topic. Defendant's Exhibit 8, Table 7. Using a binomial distribution and the Fisher's Exact Test, she found, and the Court finds, no statistical support for a non-neutral policy or of a pattern of discrimination. Subsequent to Dr. Harworth's calculations, the system hired two black assistant principals. Those hirings, if included in the statistical calculation, would give results showing more favorable treatment to blacks. Plaintiff did not note that point in her Proposed Findings. Moreover, the Fourth Circuit has warned against isolating bits or portions of statistical evidence from the total statistical picture of employment. *Roman*

---

**11.** Proof of a pattern or practice of discrimination requires proof of more than an isolated occurrence of discrimination, rather the claimant must prove that discrimination was the employer's standard operating procedure. *Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396, 416 (1977). The evidence here allows no such determination.

*v. ESB, Inc.,* 550 F.2d 1343, 1350 (4th Cir. 1976). In light of these facts the Court concludes that the circumstances do not warrant burden-shifting.

Assuming that the burden of persuasion should shift to the defendant, the Court believes that the defendant has presented clear and convincing evidence, *Knighton v. Laurens County School District No. 56,* 721 F.2d 976, that racial or sexual discrimination did not motivate any employment decision plaintiff complains about. The evidence is clear and convincing that for each position in question plaintiff ineffectively applied or failed to apply or plaintiff was found in the best professional judgment of selecting officials to be a lesser qualified person.

### CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and their dispute.

2. The defendant did not refuse to promote the plaintiff because of her race or sex. 42 U.S.C. §§ 1981, 1983, 2000e–2(a)(1).

A Judgment for the defendant will be entered accordingly.