Albert **TURNER** and Robert Goetzman, Plaintiffs,

v.

**BARBER–SCOTIA COLLEGE; Mable P. McLean, President; and the United Presbyterian Church, USA, William P. Thompson, Stated Clerk, Defendants.**

Nos. C–82–379–S, C–82–625–S.

United States District Court, M.D. North Carolina, Salisbury Division.

March 12, 1985.

Jonathan R. Harkavy, Greensboro, N.C., for plaintiffs.

Guy F. Driver, Jr., and M. Ann Anderson, Winston-Salem, N.C., for defendants.

## MEMORANDUM OPINION

GORDON, Senior District Judge.

Plaintiffs Albert A. Turner and Robert Goetzman filed separate actions against defendants Barber-Scotia College, Mable P. McLean, and the United Presbyterian Church, U.S.A., on April 2, 1982, and June 3, 1982, respectively. Each alleged that defendants had discriminated against him in terms of his employment and because of his race, in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e *et seq.*). Each also alleged that defendants had illegally retaliated against him for pursuing his rights under Title VII.

The cases were consolidated and trial was held on November 26 through 30, 1984.[1] Having fully considered the evidence presented at trial, arguments of counsel, trial briefs, stipulations, and other matters of record, the Court concludes that the plaintiffs have failed to show that defendants illegally discriminated against them because of their race or in retaliation for pursuing their rights under Title VII. Pursuant to Fed.R.Civ.P. 52(a), the Court enters the following Findings of Fact and Conclusions of Law.

## I. FINDINGS OF FACT

1. Defendant Barber-Scotia College (BSC) is an institution of higher learning and is an employer within the meaning of Title VII of the Civil Rights Act of 1964. BSC is a predominantly black private school located in Concord, North Carolina, and is owned by the United Presbyterian Church, U.S.A.

2. Defendant United Presbyterian Church, U.S.A. is now known as the Presbyterian Church (U.S.A.), and is a religious

---

1. The cases were also consolidated with contract claims that each plaintiff had pending against Barber-Scotia. The issues were whether Turner & Goetzman had achieved tenure at Barber-Scotia, and whether Barber-Scotia had breached its contracts with the professors. The case was heard before a jury, which returned a verdict that the professors did not have tenure but that the school had, in fact, breached notice provisions in their contracts. Plaintiffs were awarded damages accordingly. *Turner v. Barber-Scotia College,* No. C–83–1033–S (M.D.N.C. Jan. 8, 1985).

institution headquartered in New York City and Atlanta, Georgia. This defendant is guarantor of the mortgages on the real property owned by BSC, and annually pays principal and interest with respect to those mortgages. The Church, until 1977, also provided operating funds to BSC.

3. Plaintiff Albert Turner is a white male who is currently a resident of Houston, Texas. Turner was employed on the faculty of BSC from August 20, 1973, until May 1, 1981.

4. Plaintiff Robert Goetzman is a white male who is currently a resident of St. Louis, Missouri. Goetzman was employed on the faculty of BSC from August 30, 1973, until May 1, 1981.

5. Defendant Mable P. McLean is a black female who has served as President of BSC since 1975.

### A. *Albert Turner*

6. Turner has a Ph.D. in History from Duke University. He was hired by BSC as an Associate Professor of History in 1973, and was promoted to full Professor in 1975. McLean was Academic Dean at the time he was hired, and President when he was promoted.

7. Turner was highly respected by his colleagues and the administration at BSC. In 1975 Turner was made Director of the Center for Political and Social Development, one of five "centers" of study at BSC.

8. During the academic year 1978–1979, a contract dispute arose between BSC and certain of its faculty. BSC had promised salary increases contingent upon enrollment figures, but allegedly failed to abide by its promise. Turner was cosigner, along with Goetzman and certain other faculty members, of letters to the Board of Trustees and the Presbyterian Church concerning the "worsening problems" at BSC. During this same period Turner became involved, as Center Director, in a salary dispute between Mike Wolf, an adjunct professor within his center, and Dr. R. Timothy McDonald, then Vice President for Academic Affairs. On March 1, 1979, Dr. William E. Laukitis, Director of the Center for Humanities, resigned as a result of his own contract dispute and the alleged "hostility" of the administration.

9. During this period, certain of the faculty attempted to unionize the faculty members. Turner was active in the attempt, which failed.

10. In 1980 BSC reorganized from five "centers" to two "divisions." Turner wanted to be a division chairman but was not appointed. While at one time all the center directors had been white, the two division chairmen, Drs. Fields and Pyles, were both black.

11. On March 21, 1980, Turner was evaluated by Dr. Myland Brown, who from 1979 through 1981 served as Vice President of Academic Affairs. The evaluation was very unfavorable to Turner, and he protested for procedural irregularities and lack of substantiation. The next month Brown criticized Turner for having too few office hours. Turner responded that he had more than six hours per week as required in the Barber-Scotia Policy Handbook, and that he felt he was being harassed. Turner sent a copy of this response to a lawyer. On the same day that Turner responded to his criticism, Brown sent a memo to the Coordinator of Personnel Records stating that Turner had "left is [sic] post prior to the end of his class schedule Friday, April 4, 1980," and "left the campus at 1:39 p.m. Friday, April 4, 1980."

12. In July of 1980, Turner informed Brown that as an historian, he was unqualified to teach the Geography course Brown had assigned him the next academic year. Turner notified Brown that another faculty member was qualified, and volunteered to teach another course instead. In his memo asking for an explanation, Brown stated that Turner's "full-time salary for part-time service is not economical and will not be extended beyond Fall and Spring Semesters 1980–1981." When Turner asked for clarification of this statement, Brown concluded after reconsideration that Turner was, in fact, a full-time faculty member

because he received three hours credit as Chief Academic Advisor of Students for Social Sciences Curriculum.

13. On October 21, 1980, Turner filed charges with the Equal Employment Opportunity Commission (EEOC) claiming that he had been discriminated against in terms of salary and other conditions of employment because of his race.

14. On January 22, 1981, Turner was evaluated by Dr. Richard L. Fields, who was then Associate Dean for Special Programs. He gave Turner the highest rating in every category.

15. During February and March of 1981, Turner and Fields had a dispute over Turner's office hours. Turner accused Fields of harassment.

16. Beginning in March 1981, BSC undertook to revise its curriculum. As a result, a new "core" curriculum was developed, which included Western Civilization. When Dr. Fields informed the faculty that a new teacher would be hired to teach the course, Turner protested that as senior History professor he should be consulted in such hiring and scheduling matters and that he, in fact, was the logical person to teach the course. Turner informed the EEOC that BSC might be planning to terminate him in retaliation for having filed charges.

17. On April 27, 1981, a meeting of the BSC Academic Council was held. The meeting was chaired by Fields, and neither Turner nor Goetzman was present. The Council unanimously approved a recommendation submitted by Brown, who was also absent, to discontinue History and Political Science as majors because of lack of interest among the students.[2] The next day the recommendation was presented to the entire faculty at a meeting presided over by Dr. Fields. Turner raised concern that the manner in which the recommendation had been made violated Southern Association of Colleges and Schools Standard Five, because he was not consulted before the rec-

ommendation was made. The recommendation passed sixteen in favor, one abstention, and two against: Turner and Goetzman.

18. Less than one week later, on May 1, 1981, Turner received notice that he would not be rehired. On May 6, 1981, Turner filed charges with the EEOC claiming that his firing was in retaliation for having filed charges previously.

19. For the next school year, Ms. Patricia Buggs was hired as an instructor of History, and she taught the course in Western Civilization. Buggs is less qualified than Turner, having only an M.S. degree, but she worked for only $11,800.00; Turner had earned $17,000.00 his last year at BSC, and claims that with salary increments he would have earned $19,000.00 had he been rehired. Buggs is black.

20. Turner had never been previously fired from an academic position. Following his discharge from BSC he was unemployed except for a part-time realty business for a period of eight months. On January 25, 1982, he accepted a position with Control Data Corporation in Houston, Texas. Until June 1982, when his family could follow him to Houston, he lived there alone and commuted to Charlotte, North Carolina, to visit his family. Turner claims lost wages, travel expenses, consequential damages caused by stress and humiliation, and punitive damages against the defendants. Because of cutbacks at Control Data, Turner has been informed that he will be laid off and asks the Court to reinstate him at BSC.

### B. *Robert Goetzman*

21. Goetzman has a Ph.D. in English from the University of Iowa. He was hired by BSC as an Associate Professor of English in 1973. At that time, and throughout Goetzman's career at BSC, BSC did not offer a major in English. McLean was Academic Dean when Goetzman was hired

**2.** Only one member of the incoming freshman class had declared History as a major; three had declared Political Science. Between 1975 and 1979 only 14 History majors and no Political Science majors had graduated among the 252 total graduates with declared majors.

and President when he became a full Professor in 1978.

22. Goetzman was highly regarded by BSC students, faculty, and administration. While at BSC he was awarded a Danforth Visiting Faculty Fellowship at Princeton University, won a National Endowment for the Humanities grant, and was in charge of the Honors Program at BSC. Among the many honors bestowed on Goetzman at BSC was chairing the committee in charge of McLean's inauguration as BSC President.

23. In the fall of 1978, Goetzman agreed to teach a journalism class and publish a school paper. The paper never materialized, however, because BSC could not afford a working press.

24. In February of 1979, Dr. Laukitas, who was Chairman of Goetzman's "center," wrote to McLean complaining that Goetzman was not being paid commensurately with his rank. The College had delayed Goetzman's promotion and then his salary increase due to lack of funds.

25. During the academic year 1978–1979 Goetzman became involved in a contract dispute with BSC over its alleged failure to abide by a promised salary increase. Goetzman was cosigner, along with Turner and other faculty members, of letters to the Board of Trustees and the Presbyterian Church concerning the situation. At one time during this dispute Goetzman was shown on television telling of BSC's failure to live up to its contract.

26. During this period, Goetzman was active in the failed attempt to unionize BSC.

27. On February 28, 1980, Goetzman was evaluated by Dr. Fields, who came to BSC in 1979. Out of 12 categories on the evaluation form, Fields marked only four, and gave mediocre marks with the caveat that they were based on limited experience with Goetzman. Goetzman protested as unprofessional the vague and unsubstantiated appraisal.

28. On October 21, 1980, Goetzman filed charges with the EEOC claiming that he was being discriminated against because of race. In addition to claiming that he was paid less than black professors, he alleged that since the school had reorganized into divisions, he had been left out of division activities and had been denied a vote on division matters.

29. In January of 1981, Goetzman was given the option of serving on a committee to choose "Miss Barber-Scotia". He declined. Although BSC later claimed that Goetzman was obligated to accept, this is not true. Also, contrary to BSC's claims, Goetzman was not responsible for the failure of the school newspaper, he did not refuse to serve in the communications lab or on the special recruitment committee, and he was never paid full-time wages for a part-time courseload.

30. During February and March, 1981, while Goetzman continued to complain about being left out of his division's activities, administrators, including his division chairman, refused to sign Goetzman's supply requisitions. It became clear at trial that although Goetzman had been properly informed that Fields was his division chairman, Fields thought that Goetzman was in the other division and never notified him of division functions. Goetzman was a "man without a division." Goetzman informed McLean that he felt he was being discriminated against and harassed.

31. On March 26, 1981, Goetzman filed charges with the EEOC, alleging that BSC was retaliating against him for filing his previous charges.

32. On May 1, 1981, Goetzman was notified that he would not be rehired. On May 6, 1981, BSC placed an advertisement for a replacement for Goetzman in The Chronicle of Higher Education. On June 10, 1981, Goetzman filed further charges with the EEOC.

33. In August of 1981, BSC hired Dr. Majumdar, a Ph.D. in English, and Dr. Meeks, a Ph.D. in Education. They, along with Ms. Reid, who was already on the faculty, and who had an M.S. degree, taught the courses Goetzman had taught.

Majumdar is Asian; Meeks is black. They were hired at $14,000.00 per year each. During Goetzman's last year at BSC he received $17,000.00.

34. Goetzman had never been fired from an academic position before. In September 1981 he accepted a position at Cardinal Newman College in St. Louis, Missouri, where he has taught since. There he has received much acclaim, and in fact has been recommended as President. However, according to Goetzman's understanding, Cardinal Newman is undergoing serious financial difficulties and its future is uncertain. Goetzman seeks damages for moving expenses, mental anguish and expenses resulting therefrom, punitive damages, and reinstatement at BSC.

### C. Barber-Scotia College

35. A jury has decided that Turner and Goetzman did not have tenure at BSC so it is not necessary that BSC prove their firings were based on cause or financial exigency.[3] It is relevant, however, that on July 24, 1981, in response to the EEOC's request for information, BSC stated that Turner was fired for financial exigency and discontinuance of major, and Goetzman was fired for financial exigency. BSC's response to the EEOC also shows that all the other faculty members not rehired as of May 1, 1981, had been hired since 1979; Turner and Goetzman were senior professors in their respective departments, each hired in 1973.

36. BSC operates on a very limited budget. In 1977 BSC lost funding from the Presbyterian Church and has since been required by the church to operate in the black. BSC continues to operate with a surplus, and shortly after Turner and Goetzman were fired the number of faculty members at BSC was increased. Therefore, BSC was not financially exigent in the sense that its financial survival required the firings, although the school's financial situation is difficult.

37. In May of 1981, BSC had eighteen full-time faculty members—thirteen blacks, four whites, and one "other". In September, 1981, BSC had twenty-six full-time faculty—nineteen black, four white, and three "other". Although the percentage of white faculty members was smaller, it should be noted that two new whites were hired after Turner and Goetzman were fired.

38. In the spring of 1983, the State Department of Public Instruction Division of Accreditation and Program Approval reported to the State Board of Education concerning BSC. This report was to determine if BSC should retain accreditation so its graduates could become public school teachers. Deficiencies were specifically noted in Western Civilization and certain English courses, courses taught by faculty hired to replace Turner and Goetzman. Accreditation approval was denied.

39. The senior administrators at BSC were aware that Turner and Goetzman had filed charges with the EEOC before Turner and Goetzman were discharged. Any testimony to the contrary by Brown is discredited.

## II. DISCUSSION

Plaintiffs claim that they were discriminated against in violation of Title VII and 42 U.S.C. § 1981. The framework of proof under these two provisions is the same. Plaintiffs did not offer direct evidence of discriminatory animus, therefore we must look to the scheme of inferences and presumptions judicially adopted in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

To prove their case in this manner, plaintiffs have the burden to make a *prima facie* showing of discrimination. This requires "proof by a preponderance of the evidence that the plaintiff was not promoted or dismissed 'under conditions which, more likely than not, were based upon impermissible racial considerations.'" *Gairola v. Virginia Department of General*

---

**3.** Once a teacher is awarded tenure, he can only be terminated for cause or financial exigency.

These are relatively strict standards.

*Services,* 753 F.2d 1281, 1286 (4th Cir., 1985) (quoting *Young v. Lehman,* 748 F.2d 194, 196 (4th Cir.), *petition for cert. filed,* 53 U.S.L.W. 3568 (U.S. Feb. 1, 1985) (No. 84–1239)). In this context, a *prima facie* case is "not the equivalent of a factual finding of discrimination ... [r]ather, it is simply proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 579–80, 98 S.Ct. 2943, 2951, 57 L.Ed.2d 957 (1978).

If plaintiff makes a *prima facie* showing, then:

the burden of producing evidence shifts to the employer to articulate through the introduction of admissible evidence, a clear and reasonably specific legitimate, nondiscriminatory reason for its action. The articulation of this reason dispels the adverse inference arising from the claimant's *prima facie* showing and entitles the employer to a judgment unless the claimant in the final stage of this scheme of proof can show that the stated reasons (*i.e.,* plaintiff is not as qualified) are pretexts for discrimination. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Cuthbertson v. Biggers Brothers, Inc.,* 702 F.2d 454, 458 (4th Cir.1983). A claimant can show pretext by evidence showing that "a discriminatory reason more likely motivated the employer or ... the employer's proffered explanation is unworthy of credence." *Texas Department of Community Affairs v. Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095, 67 L.Ed.2d at 217. Plaintiff's evidence must support with "substantial" or "reasonable probability," as distinguished from "possibility" or "speculation," plaintiff's contention that defendant's explanation is pretextual. *Fink v. Western Electric Co.,* 708 F.2d 909, 916 (4th Cir.1983). In this respect, it is not sufficient merely for a claimant to persuade the Court that the employer

misjudged [his] qualifications, because an employer is entitled to exercise its own judgment as to qualifications. *Texas Department of Community Affairs v. Burdine,* 450 U.S. at 259, 101 S.Ct. at 1096, 67 L.Ed.2d at 219; *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1012 n. 6 (1st Cir.1979). The burden of persuasion under this scheme of proof remains throughout on the claimant.

*Love v. Alamance County Board of Education,* 581 F.Supp. 1079, 1092 (M.D.N.C. 1984), *aff'd.,* 757 F.2d 1504 (4th Cir.1985).

■ Absent direct proof of discriminatory intent, plaintiff can prove the elements of a *prima facie* case of discrimination by showing:

(i) that he is a member of the protected class; (ii) 'that he ... was qualified for [the] job [and his performance satisfied his employer's expectations] ...; (iii) that, despite his qualifications [and performance], he was [dismissed]; and (iv) that, after his [dismissal], the position remained open and his employer continued to seek applicants from persons of complainant's qualifications.'

*Gairola,* 753 F.2d at 1286 (*quoting Smith v. University of North Carolina,* 632 F.2d 316, 332 (4th Cir.1980)). Analyzing the proof in the subject case according to this scheme, plaintiffs fall within a protected racial class. *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). Although both were clearly well qualified for the job, a question arises whether near the end of their tenures (used in the nontechnical sense of the word) at BSC, Turner and Goetzman were performing satisfactorily according to the legitimate expectations of BSC. This is the most difficult question arising in this lawsuit.

For years Turner and Goetzman were two of the top professors at BSC. Their credentials relative to the other faculty members were outstanding, and they earned the respect and admiration of students, faculty, and administration. But all

this began to change in the 1978–79 academic year when the contract dispute arose.

According to the testimony of President McLean, who was clearly the most persuasive and credible witness offered by BSC, the contract dispute arose out of a shortage of funding at BSC which left the school unable to abide by its faculty contracts. Because of these and other tensions between administration and faculty, Turner and Goetzman became deeply involved in attempts to unionize the BSC faculty. The attempt failed, and thereafter relations between the two professors and the administration were strained. McLean testified that her vision of the College's mission is that the faculty members, as a community, work toward the total growth of their charges; eighty per cent of the students at BSC come from families with no previous college experience, and ninety per cent require financial aid. McLean wanted the faculty community to develop the students into well-rounded individuals, including all aspects of social, intellectual, and spiritual development. Turner and Goetzman, she contends, failed to serve as integral parts of that community effort after the aborted union drive.

Turner and Goetzman had a somewhat different vision of BSC. They saw the school as a more professional and purely academic institution. They fought for strict adherence to the guidelines set forth by the Southern Association of Colleges and Schools (SACS), of which BSC was a member, and to the Statement of Principles on Academic Freedom and Tenure of the American Association of University Professors (AAUP), to which BSC ascribes. Turner and Goetzman expressed concern that BSC might lose its accreditation unless stricter attention were paid to these guidelines by BSC. Their motivation was probably a sincere concern for the academic standards and reputation of BSC as an institution. But the administration at BSC, in its continuing efforts to keep the financially troubled school afloat, frequently chose to give such guidelines secondary priority to what it considered its primary goal: the survival of BSC as an institution. The administration saw the efforts of Turner and Goetzman as disruptive and counterproductive; they were making waves in already troubled waters.

Turner and Goetzman began to be seen and treated as outsiders at BSC. They were viewed as conspirators against the faculty community, and were subjected to close and critical scrutiny. Questions were raised about Turner's office hours, and the courseloads of both professors were challenged. Both professors were reprimanded for failure to participate adequately in extracurricular activities. At trial BSC failed to prove by objective evidence that these criticisms were well founded. However, at least as concerned President McLean, the conviction that Turner and Goetzman were not fulfilling their proper roles in the BSC community was sincere, even if highly subjective.

"When the evaluation of an employee's performance is based on subjective criteria, and when the evaluators are themselves not members of the protected minority, the challenged employment decision is subject to particularly close scrutiny by the trial judge." *Page v. Bolger,* 645 F.2d 227, 230 (4th Cir.) (en banc), *cert. denied,* 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981). We must remember, however, that the ultimate burden of proving that the decision was improperly motivated rests with the plaintiff. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093.

In determining whether Turner and Goetzman were satisfying BSC's legitimate expectations, the Court is constrained to give great credence to President McLean's articulation of what those expectations are. Because BSC is a small, financially limited Christian school that considers its mission a community effort toward the total growth of each student, it is essential that each faculty member work efficiently within that community and be dedicated toward that goal. It is clear that after the contract and labor disputes of 1978–1979, Turner and Goetzman became aloof from

that community and diverted from that goal. Whether it was due to a certain elitism on the part of the two professors or resentment on behalf of the administration is not for the Court to say. It is for the Court to determine whether the wedge driven between the two white professors and the predominantly black school was one of racial animus. The Court concludes that it was not.

■ Plaintiffs ask the Court to infer illegal animus from BSC's failure to abide by standards and procedures set out by the AAUP, the SACS, the BSC Handbook, and the professors' yearly contracts. Plaintiffs contend that, unless it were trying to hide something, the school would have lived up to its various obligations. It became clear during trial, however, that the proper inference to be drawn is that BSC was willing to sacrifice those obligations in favor of the survival of BSC and its mission. Plaintiffs failed to prove racial motivation for the school's actions. If certain other faculty members were treated differently, if some received extra assignments and as a corollary slightly more pay, it was due to their being more philosophically aligned with the administration. That these people were black is a function more of the nature of BSC as a predominantly black institution and not evidence of discriminatory animus.

Thus, the Court is unable to conclude that, at the time they were fired, Turner and Goetzman were fulfilling the legitimate expectations of BSC, and is unable to infer from the evidence that race was a determining factor in the decision to discharge them. Therefore, it is concluded that plaintiffs have failed to establish a *prima facie* case of racial discrimination.

■ Plaintiffs have also alleged that the actions taken against them were in retaliation for their having filed charges with the EEOC. Both Turner and Goetzman first filed charges on October 21, 1980, and Goetzman filed his first retaliation claim on March 26, 1981, charging that the adminis-

tration's failure to let him participate in divisional meetings and refusal to approve his supply requisitions were retaliatorily motivated. Turner and Goetzman were fired on May 1, 1981, after which they each filed retaliation charges. Although the firings followed closely on the heels of the bringing of charges, plaintiffs have failed to prove a causal connection. Goetzman's problems with requisitions and departmental assignment were a result of poor communication among the BSC administration and possibly personal animus, but not retaliation for earlier charges. The EEOC charges came in the midst of a larger and more profound controversy, and though they may have added to the growing sense that Turner and Goetzman were troublemakers and not to be trusted, plaintiffs failed to prove that the filing of the charges was the cause of the school's actions.

■ In their brief plaintiffs claim that to prove retaliatory discrimination under Title VII and § 1981 they must show as one element a "protected opposition to employment practices or participation in charges of discrimination known by defendant." For this proposition they cite *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir.1980), in which claimants succeeded in proving retaliation for filing charges with EEOC. Turner and Goetzman then argue that "they opposed BSC's employment practices beginning about three years before their discharge when they raised questions about a number of terms of employment and ultimately sought to form a union to handle their grievances." Plaintiffs' Post-Trial Brief p. 4. While it is true that after the labor dispute BSC's attitude toward plaintiffs began to change, the labor activity was not in response to racial policies. Thus, it was not the type of protected activity contemplated within a Title VII or § 1981 retaliation claim, and *Grant* is inapposite. Any causal connection between the labor dispute and BSC's treatment of plaintiffs is irrelevant to this lawsuit. It is

concluded that plaintiffs have failed to prove that the decision to fire them was in retaliation for plaintiffs' exercise of their rights to file EEOC charges, and have not made out a *prima facie* case of retaliatory discrimination.

 Because proving a *prima facie* case is a relatively low threshold burden the Court will add that, assuming *arguendo* that plaintiffs had satisfied the requirements of a *prima facie* case of discrimination, BSC has met its burden of articulating legitimate nondiscriminatory reasons for discharging the two professors. These reasons, as already indicated, are extremely subjective and therefore merit close scrutiny. The Court concludes, however, that considering BSC's unique situation and perspective, the reasons it has articulated are legitimate and have rebutted any inference of discrimination.

■ Plaintiffs, on the other hand, have failed to show that the reasons articulated for the firings were pretextual and that racial animus motivated the decision. Indeed, some of the school's allegations about plaintiffs' conduct were exaggerated, but by claiming tenure, Turner and Goetzman put BSC in the position of trying to prove "cause" for the firings. And while there was animus between the school and the two professors, its roots were professional and philosophical. The administration was in a position to enforce its views and did. Although the Court does not condone its methods, neither will it condemn them as pretexts for racially motivated behavior.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and over the subject matter of this action.

2. Defendants did not discriminate against plaintiffs Turner and Goetzman because of their race in violation of 42 U.S.C. § 1981 and 42 U.S.C. § 2000e-2(a).

3. Defendants did not discharge the plaintiffs Turner and Goetzman in retaliation for charges filed with the EEOC in violation of 42 U.S.C. § 2000e-3(a).